## Application of DADE COUNTY NEWSDEALERS SUPPLY CO.

Railroad & Public Utilities Commission.
December 8, 1950.

Louis M. Jepeway and John G. Dauber, both of Miami, and Jeptha P. Marchant, of Miami and Tallahassee, for applicant.

Harold B. Wahl, Jacksonville, and John H. Wahl, Jr., Miami, for Southern Bell Tel. & Tel. Co.

George M. Powell and George E. Owen, both of Tallahassee, and Mallory H. Horton, Miami, for the Attorney General.

Lewis W. Petteway and Guyte P. McCord, Jr., both of Tallahassee, for the Commission.

Chairman WILBUR C. KING, Commissioner JERRY W. CARTER and Commissioner RICHARD A. MACK participated in the hearings and disposition of the cause.

BY THE COMMISSION.

On May 10, 1950 Southern Bell Tel. & Tel. Co. notified the applicant, Dade County Newsdealers Supply Co., that it would on May 13, 1950 discontinue all telephone service and remove its telephone facilities from the subscriber's place of business, pursuant to official notice from the Attorney General that the telephone facilities had been used in connection with unlawful activities.

A temporary restraining order was granted by the circuit court of Dade County on May 12, 1950 and the telephone facilities were allowed to remain in service pending the final order of the court. On final hearing the temporary injunction was dissolved.

Thereafter on July 18, 1950 while telephone facilities were still in service, Dade County Newsdealers Supply Co. filed its petition with this commission seeking an opportunity to be heard in defense of its alleged right to keep and maintain the telephone facilities and service. This petition was denied by the commission on July 18, 1950 on the ground that the commission's rule DID NOT provide for a hearing until AFTER the telephone facilities had been disconnected and service thereover discontinued. On certiorari proceedings the Supreme Court affirmed the order of the commission and refused to issue its constitutional writ restraining removal of the telephone facilities pending hearing under the commission's rule. Dade County Newsdealers Supply Co. v. Florida R. R. & Public Utilities Comm., 48 So. 2d 89.

Immediately following the Supreme Court's refusal to interfere with the removal of facilities the telephone company did in fact discontinue telephone service and remove the facilities. Thereupon Dade County Newsdealers Supply Co. applied to this commission for reinstatement of the service and facilities. Pursuant to the application a public hearing was held by the commission in Tallahassee commencing on August 4, 1950, and another in Miami commencing on October 20, 1950.

Dade County Newsdealers Supply Co., a Florida corporation, whose principal place of business is located at 146 N. W. First Court, Miami, is engaged in the wholesale distribution and sale of magazines, publications, periodicals and out-of-state newspapers. In the conduct and operation of its business it has large and substantial investments, employs more than fifty people, and maintains and operates more than thirty trucks. This company has operated in Dade County for the past 18 years and currently distributes more than 415 national magazines and 65 national newspapers. Some of the publications distributed by the applicant are Saturday Evening Post, McCall's, Reader's Digest, Coronet, Liberty, New York Times, Philadelphia daily papers, Atlanta daily papers and many others.

In addition to the foregoing magazines, newspapers and other publications of a similar nature, the applicant also ditributes various sports digests, wall charts, scratch sheets and similar publications relating to horse racing. The applicant purchases and distributes the entire output of Miami Publishing Co., the publisher of Harvey A. Jr., Daily Sports Digest, which publication is devoted almost entirely to horse racing information. Applicant also takes the entire publication of wall charts published by Graham Press. These charts are peculiarly adapted to use by bookmakers in keeping up with the races at different tracks during the racing season and in keeping such information posted on the wall or other conspicuous place for ready use and information of those frequenting places where bets may be made on the races. Applicant testified that approximately 40% of its total volume of business is involved in the distribution of publications devoted to racing information. The gross business of applicant during its last fiscal year from the sale and distribution of magazines, newspapers, periodicals, and all other publications, was approximately $1,700,000.

Under the applicant's method of operation, it furnished office space and telephone facilities to the representatives of all

publications handled by it. Many publishers make it a practice to keep a representative in Miami on a full time basis. For example, Curtis Publishing Co. maintains a representative in Miami on a full time basis and during the winter season has as many as six representatives stationed in that city. Office space and telephone facilities are provided for these publisher representatives without charge, except for toll charges incurred by the use of applicant's telephone facilities. These toll charges are paid by the various publishers at the end of the month after applicant receives its monthly telephone bill from the telephone company. The manager of the Miami branch of Curtis Publishing Co. testified that during the three years he has currently been in the Miami area he has used the facilities furnished by the applicant and that he has during that time observed more than twenty representatives of at least that many publishers using similar facilities furnished by Dade County Newsdealers Supply Co. He also testified that the loss of telephone service had seriously interfered with and hampered his own company's business in Dade County to such an extent that circulation had dropped approximately 15% since the telephone service had been discontinued. While the contract between the individual publisher and its distributor, the applicant herein, does not, at least in the case of Curtis Publishing Co., require the distributor to furnish publisher's representatives with office space and telephone service, this practice does appear to be a trade policy which is enjoyed by Curtis Publishing Co. in many other communities where it maintains representatives.

As a part of its distribution system applicant maintains sales stands within the confines of various horse race tracks. At the Hialeah track five such stands are maintained in the race track area and club house. At Tropical Park race track ten such stands are maintained within the track enclosure. These stands have been maintained within the track enclosures for the past thirteen years and apparently with the full approval of racing officials.

During the year 1949, Western Union Telegraph Co. maintained two leased wire facilities into the state of Florida which were used by the subscribers thereto for the dissemination of information in furtherance of gambling or for gambling purposes. One of these wires was a Morse telegraph operated circuit that originated in Baltimore and extended to Miami with intermediate drops at various cities en route. The other wire was a leased circuit that originated in New Orleans, and ex-

tended to Key West with drops in Jacksonville and Miami. Arrangements for the leased wire from Baltimore were negotiated by Radio Program Press Service of Baltimore, which was one of the parties seeking to have the Florida courts declare chapter 25016, Laws of Florida, Acts of 1949, unconstitutional. Arrangements for the other leased wire were made by W. M. Hagerty, owner of Intrastate News Service, the other party to the court attack on chapter 25016 which law prohibits the use of "private wire" facilities in the dissemination of information for gambling purposes. Each one of these leased circuits had a drop or connection located on the premises of Dade County Newsdealers Supply Co. in Miami. The Morse circuit, or the leased wire from Baltimore, was so constructed that the individual drops could be used for both sending and receiving communications. The New Orleans wire, which was a ticker service, was somewhat different. It was connected with only one combination transmitter-receiver instrument in the Miami area which was located on the premises of Dade County Newsdealers Supply Co. Western Union also provided at this same location a series of unequipped circuits over which communications could be transmitted by voice. In December of 1949 this commission found that all these facilities were being used for the dissemination of information in furtherance of gambling or for gambling purposes and required service to be discontinued and the facilities disconnected and removed under the tariff provisions of Western Union Telegraph Co.

Prior to July 18, 1950 exchange telephone service was furnished to Dade County Newsdealers Supply Co. at 146 N. W. First Court through ten trunk lines, a switchboard and 17 extension telephones. The trunk lines carried telephone numbers 3-6321, 3-6322, 3-6323, 3-6324, 3-6325, 3-6326, 3-0670 and 3-2130. The records of the telephone company show that frequently long distance telephone calls were originated over telephone numbers 7-7656, 7-7657, 7-7658 and 7-4130 listed in the name of Graham Press but were charged to applicant's telephone numbers 3-6321, 3-6326, 3-0670 and 3-2130. Many of these calls were to known disseminators of racing information in New Orleans, Baltimore and Chicago. The telephone company's records also disclosed toll calls between numbers listed in the name of the applicant herein and known bookmaking establishments in Broward County.

A series of eighteen checks drawn on two different banks in Miami Beach were introduced in evidence. These checks

were all drawn by S & G Service on either the Mercantile National Bank or the Miami Beach First National Bank and extend over a period running from December 18, 1948 to May 5, 1950. Most of them were payable to Intrastate News Service, some to cash and others to Morgan O'Brien. All of those payable to Intrastate News Service were endorsed by Walter M. Hagerty as owner. All of the checks were deposited in the First National Bank of Miami to the credit of Dade County Newsdealers Supply Co. Most of the checks were for $2,500, some for $1,500, some $600, one was for $349.50, some for $1,000, and one for $3,000 which was payable to "cash" and endorsed by "Ed Petri" who is vice-president and general manager of Dade County Newsdealers Supply Co., the applicant herein. S & G Service and S & G Syndicate are the same and for years S & G Syndicate has monopolized the bookmaking operations on the lower east coast.

The vice-president and general manager of the applicant testified that Dade County Newsdealers Supply Co. makes it a policy to furnish office space and telephone facilities to all publishers with whom they do business and that applicant is not concerned with and cannot know what use they may make of said space and telephone facilities. He denied that applicant made any of the telephone calls in question or that it in any way participated in the dissemination of racing information by telephone or telegraph facilities. He also testified that his company makes it a practice to cash checks for publishers and their representatives and that the checks were cashed by him and his company for the payees thereof purely as a matter of accommodation and then deposited to his company's account. Those checks payable to cash were handled for the same parties on the same basis according to the witness.

While the evidence herein does not directly connect Dade County Newsdealers Supply Co. and its officers with the illegal use of telephone facilities which is prohibited by the rules of this commission, nevertheless the evidence of record conclusively shows that telephone and telegraph facilities located on the property of Dade County Newsdealers Supply Co. have been used for years in the dissemination of information in furtherance of gambling or for gambling purposes. The trade policies and practices of applicant have made it possible for its own business premises to be used as one of the primary centers for the dissemination of information in furtherance of gambling or for

gambling purposes. It is difficult to understand how the applicant and its managing officers could remain blind for years to the illegal business which was being carried on under its very roof and over its own communication facilities.

We have said before that it is the opinion of this commission that the owner of property who permits others to use it is under an obligation to see that his property is not used contrary to the laws and the public policy of the state. The state's efforts to break up bookmaking operations and the use of telephone facilities in connection therewith have been in the public press almost daily for more than a year, particularly in the Dade County area, and there can be little excuse for lack of knowledge concerning the public policy of the state in matters of this kind. Where the availability of telephone service and facilities is an important consideration in maintaining a business relationship between the owner of property and those who occupy and use that property, and the owner of such property undertakes to furnish that telephone service, then such owner must exercise proper care to see that the telephone service and facilities are not used for illegal purposes if he wants to avoid the risk of being deprived of such service and facilities.

The telephone facilities involved in this proceeding are general exchange telephone facilities which are exempt from the provisions of chapter 25016, Laws of Florida, Acts of 1949, which prohibits the use of "private wire" service and facilities in the dissemination of information in furtherance of gambling or for gambling purposes. However, the use of such facilities as demonstrated by the record herein comes clearly within the purview of this commission's rule prohibiting the use of all telephone and telegraph facilities and services for illegal purposes. This rule was adopted by the commission in an effort to strengthen the hand of the law enforcement officers of the state and make it possible for them to quickly reach and discontinue telephone and telegraph services and facilities which do not come under chapter 25016, supra, but which are being used contrary to law. This case falls within the purposes of that rule and its applicability in this particular case was affirmed by the Supreme Court. Dade County Newsdealers Supply Co. v. Florida R. R. & Public Utilities Comm., 48 So. 2d 89.

Cases of this kind present a difficult question for determination. What penalty shall be assessed? Of course, the only penalty which this commission can assess against the telephone subscriber is the deprivation of telephone service. When one is de-

prived of telephone service because of illegal use, how long shall that deprivation run? When one loses his telephone service because he has permitted another to use it in violation of law, how long shall he be required to do without such service? In the present case we have a legitimate business establishment whose trade policies and practices have made it possible for others to violate the laws and public policy of the state. From its legitimate business the applicant grosses in excess of one and a half million dollars annually. Telephone service to such a business is highly important. Loss of such service for a single day is a serious handicap. Here the applicant has already been without telephone service for four and a half months. It is the opinion of the commission and it finds that such loss of service is justified by the record herein. However, the commission is also of the opinion, and so finds, that further deprivation of service is neither justified nor necessary. We cannot believe that applicant, after having lost its telephone service for a period of four and a half months, will permit its property and facilities in the future to be used in violation of the laws and public policy of this state.

In permitting telephone service to be restored to applicant herein it is the opinion of the commission, and it so finds, that the telephone company should be directed to keep an accurate record of all long distance telephone calls handled over the facilities until the further order of the commission and make the same available to this commission and all responsible law enforcement officers upon reasonable request therefor.

Now therefore, in consideration thereof, it is ordered, adjudged, and decreed that the application of Dade County Newsdealers Supply Co. for restoration of telephone service be and the same is hereby granted, and Southern Bell Tel. & Tel. Co. is hereby authorized and directed to restore telephone service and facilities to the Dade County Newsdealers Supply Co. upon proper application therefor and in conformity with its usual and customary business practices relating to the installation of telephone service. It is further ordered that the telephone company be and it is hereby directed to keep and maintain accurate records of all long distance telephone calls handled over or charged to said telephone facilities and make the same available to this commission and to all responsible law enforcement officers upon reasonable request until the further order of this commission.